# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 20-13146-KHT |
| LIQUID COLLECTIVE LLC ) | |
| ) | Chapter 11 |
| ) | |
| Debtor. ) | |

## MOTION TO COMPEL TURNOVER OF ESTATE PROPERTY

Liquid Collective LLC ("Debtor"), by and through their counsel, Michael J. Davis of Davis Law Group LLC, hereby respectfully submits this Motion to Compel Turnover of Estate Property (the "Motion"), and in support thereof, states as follows:

## Background

1. The Debtor filed its Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code on May 7, 2020 (the "Petition Date").

2. The Debtor continues in possession of its property and is operating and managing its business, as debtor-in-possession, pursuant to Bankruptcy Code §§ 1107 and 1108.

3. The Debtor is a corporation in the business of creating alcoholic beverages for US and Foreign Markets who also manages brand(s) related issues.

4. "SUP!" is one of the Debtor's exclusive formulations and products. SUP! has been launched across the US and to date has been very successful inclusive of achieving first day shelf space in many national chains. That achievement is rare for a new beverage. (See Affidavit of Dennis Scott Robinson, Esquire @ ¶25 thru 27) (hereafter "Atty SR Aff ¶ ___").

5. The brand and likeness "SUP!" is a Trademark owned whose owner is registered with the United States Patent and Trademark Office (USPTO). ("Atty SR Aff ¶25f").

6. It is quite common to have portfolios of trademarks and/or brands owned by separate and distinct legal entities, as is the case with the "SUP!" trademark.

7. The Debtor also created and uses a brand for daily operations known as "Drink Design Collective" ("DDC") which collaborates across brands. DDC was sometimes appointed as an agent of the Debtor for various portions of the day to day operating functions such as making, selling, Quality control, billing, and collecting money due to it from US Distributors. ("Atty SR Aff ¶12 thru 14").

8. The Debtor has a portfolio of US Distributors (in excess of 55) serving a broad geographic swath of the United States that supply and/or place SUP! on the shelves of various National Retail Chains as well as independent and smaller chain retail outlets. Many of the nation's

largest chains have already mandated (required) that their individual stores purchase "SUP!". This amounts to guaranteed business from thousands of stores in the most populous stated in the US. ("Atty SR Aff ¶25").

9. The Debtor's distributor contracts grant exclusive benefits to the Debtor, they are essential and a highly prized portfolio of relationships that any alcohol brand values highly, and in the case of SUP! it is especially so as they combine with their unique National Chain Store mandates to form a very powerful and able sales pipeline.

10. The Debtor's Distribution contracts are exclusively for the benefit of the two parties and comprise in the aggregate the only third-party Distributors that have the rights to represent the SUP! name, handle and sell SUP! and for the Debtor, collect the money related to the sales of the brand.

11. Milwaukee Brewing Company (MBC) is a craft beer brewery operation located in Milwaukee Wisconsin and is controlled by Jim Hughes, it's Chairman and controlling voting interest and is run by his hand-picked "turn-around" CEO David Hock.

12. Jim Hughes appointed Dave Hock in June, 2019 to be MBC's agent of change and gave him daily operating authority. Hock's hiring was made specifically to implement changes and stem the losses of MBC as the former CEO had been unable or unwilling to do.

13. Dave Hock was awarded 7% of MBC ownership upon starting which he was told had a value of approximately 7% of $5,000,000 (a "best guess" value of MBC according to the writings of MBC Board Member deJong). In the trusting eyes of Dave Hock at that time, this equaled further compensation of $350,000.[1]

14. Dave Hock was also awarded a fixed salary of $250,000 and expressed on multiple occasions that there were promises he could purchase more and discounted MBC equity and earn a bonus of another $50,000 cash in his first year.

16. Through 2019 MBC made and sold ONLY "craft" beer, 98% or more of which was sold in the state of Wisconsin and through just one Distributor. In fact, the Distributor is the very same one that had employed Dave Hock as a Senior Sales Executive for many years. In previous years Dave Hock also tried to purchase MBC but represented that the numbers were just not right.

17. Beechwood has an exclusive Distributor Agreement for SUP! with the Debtor, distinct and separate from a Distributor Agreement(s) with MBC for Craft Beer. Craft beer was on a volume and consumer popularity decline/over-supply through 2019 and the category was suffering as a result and under-performing compared to its historical results. Hard Seltzer is commonly referred to as the hottest emerging category and is racking up explosive and exponential growth.

18. About the third or fourth quarter of 2019, MBC came into contact with the Debtor as a result of MBC searching for contract brewing business to fill its soon to open and oversized new brewery on 9th Street, Milwaukee, Wisconsin. The lavish brewery was a huge and looming overhead problem that CEO Hock was trying to address. (See Affidavit of R Scott Brooks @ ¶5 thru 8) (hereafter "Brooks Aff ¶ ___"). ("Atty SR Aff ¶11, 25A, 25B").

19. By the end of November, 2019, Jim McCabe as an Officer of MBC had negotiated and signed on behalf of MBC a <u>binding non-exclusive production agreement</u> with the Debtor. That contract assured the Debtor of a manufacturer of "SUP!" and provided for the manufacturing of

---

[1] The Debtor received this information in disclosures given by MBC regarding forming a partnership under the DDC brand and provided for the manufacturing of finished goods and in volumes required given SUP!'s upcoming 2020 National rollout

product and in the volumes required for SUP!'s upcoming 2020 national roll-out. ("Atty SR Aff ¶11, 25A, 25B"). ("Brooks Aff ¶7, 8").

20. The contract is simple and called for a threshold amount of goods to be produced and billed by MBC at one of two prices dependent upon packaging choices (six packs v. 12 packs). The price is commonly called the case price.

21. Even more important than the case prices (which many breweries could match or even be slightly lower then) were the "terms" MBC used to entice the Debtor to do business with MBC and just as a non-exclusive brewing contractor. ("Atty SR Aff ¶25A, 25B, 11"). ("Brooks Aff ¶8").

22. Specifically, MBC represented to the Debtor that it would give the Debtor 60 days to pay for finished goods and that it would carry up to a $1,000,000 balance for SUP! (basically, an interest-free line of credit of one million US dollars). (See Attached Exhibit 3).

23. Hock as CEO of MBC then began influencing the MBC-LC (SUP!) relationship and ultimately took over all dealings between the Debtor and MBC and McCabe was pushed aside. It was commonly known that SUP!'s volume was critical to MBC supporting their lush and brand-new flagship brewery. ("Atty SR Aff ¶25A, 25B"). ("Brooks Aff ¶7").

24. On or around January, 2020 Hock and in his capacity as CEO, also became party to and signed the volume amendments to the existing and binding production agreement. Hock was bullish on SUP! and agreed to <u>double</u> the prior contract's production commitments and all the while keeping the very favorable terms of payment <u>and</u> the line of credit. These terms remained material and ongoing inducements to do business with Hock and MBC. Hock repeatedly represented that the finances of MBC could support the commitments he was making. Hock also agreed to and then did improve Quality Control and manufacturing best practices in the new brewery with the jointly agreed upon and hiring of a thirty year plus brewing veteran. ("Atty SR Aff ¶25A, 25B"). ("Brooks Aff ¶7"). (See Attached Exhibit 3).

25. At the time that the Debtor and MBC were working under the volume adjusted production agreement, Hock promoted the idea that a closer business relationship "made sense." ("Atty SR Aff ¶14, 15, 18, 19, 21").

26. As a result of the Hock overtures and offerings to create a new business relationship, MBC and the Debtor began negotiating the framework of a deeper "Joint Venture" or similar type relationship. ("Atty SR Aff ¶19").

27. By January, 2020 a first Letter of Intent (LOI) describing a potential structure was agreed to and wherein further financial representations and inducements were made by MBC. The JV distinctly and purposefully never set aside nor modified existing obligations between the parties. The terms were offered and agreed upon by Hock, Jim Hughes and general Counsel, shareholder, board member and un-secured lender Robert deJong, CPA Weber's statements & Attorney deJong's upbeat representations as to MBC financial standing (consistent with what he had told Hock just months before when signing him up) brought with them a particular degree of reliance because of their seniority and the professional designations of CPA and that deJong represented he was an esteemed Officer of the Court. ("Atty SR Aff ¶12, 25"). ("Brooks Aff ¶7").

28. MBC by and through Hock, Hughes and deJong (hereinafter referred to collectively as the "MBC Executives"), <u>made written representations</u> to the Debtor and others that MBC had asset valuations of $11,774,527 (and a "net" value of $7,911,088 +/-) and that they brought such financial strength to the new venture even given the planned assumption of a modest debt load they were carrying (represented as about US$3,863,439). All figures provided were represented by

Hock, Hughes and deJong as being based upon "historical balance sheets," were in writing and without hedge or qualification. ("Atty SR Aff ¶15, 16, 17"). ("Brooks Aff ¶8"). (See Attached Exhibit 4).

29. Per the terms of the LOI to form this new venture, the Debtor's 50% ownership was valued equally at $11,774,527 and their "net equity" the same as they came into the JV with zero debt to assume. The Debtor had a higher net worth than MBC, or $11.8M +/- and both parties had a priority claim to the first US$40million of venture gains .

30. A Day One draft balance sheet for a JV was part of the documentation and documented in considerable detail the agreed upon financial principles and underpinnings of the LOI. The day one balance sheet was received and given ample time for review by MBC Counsel and others and no objections were ever raised either in writing or by other known means.

31. In February, 2020, an amended LOI was agreed upon, in which the same individuals for MBC continued to repeatedly offer their financial assurances just as they previously had done in promoting their value in being party to the first LOI. ("Atty SR Aff ¶16, 17, 18"). (See Attached Exhibit 4).

32. The changes in the second LOI did not in any way change the material inducements made by MBC (the financial underpinnings) and outlined in the first LOI. In fact, the same financial representations were reasserted and again signed off on by MBC and its senior most executives (Chairman Hughes and CEO Hock) and were very well known to MBC legal counsel deJong, who was integral to the discussions and amendment. (See Attached Exhibit 4).

33. After the second LOI in February, MBC behavior changed color, became erratic, disjointed and otherwise troubling, eventually leading to various acts of aggression, improper behavior and ultimately mean-spirited personality sniping.

34. MBC's various acts of aggression came to include but were not limited to the following ("Atty SR Aff ¶34 thru 45"):

a. Stealing and cashing checks totaling over US$140,000.00 known to them and by their own writings (inclusive of CPA Weber's offers of safekeeping and comfort) to be the property of Debtor (See Attached Exhibit 5);

b. The unlawful takeover and possession of passwords and control of e-mail servers including reading and otherwise benefiting from communications meant for others and refusing to turnover such (See Attached Exhibit 6);

c. theft of US Mail and its contents, Mail Fraud and use of the contents of mis-appropriated possessions of the US Postal Service to pressure & coerce negotiations in an abusive manner;

d. acts of unjust coercion & demand with the goal of extracting draconian contractual re-statements out of the Debtor and thus relieving MBC's of its existing contract obligations to provide millions in cash and/or trade credit and at already agreed upon prices (See Attached Exhibits 7, 9);

e. ultimately and most disgracefully MBC showed utter disregard towards their financial obligations and towards the welfare of then known to them to be key SUP! sales channel employees (and their families) and all of which was painfully orchestrated by means of MBC's knowledge of the claw-back of payroll, already properly issued and deposited and for work already provided. In short, and after checks were e-deposited,

several days later the money was withdrawn without notice to the employees or anyone other than an earlier warning from Atty deJong that if Debtor did not cave to certain demands by a given and very short self-imposed timeline, <u>future</u> (not past) payroll would have to be reorganized. MBC shoved families in the lurch making their own mortgage payments and such get returned as no good and knowingly did so by failing to fund and/or grabbing past payroll back out of employee bank accounts. MBC did so so as to further pressure the Debtor to cave to their draconian terms and demands for cash infusion(s) and did it with mean spirit and in the midst of the building pandemic. Based upon information and belief, CEO Hock, CPA Weber and others at MBC got paid at the same time yet suffered no wrongful claw-back as against their accounts and/or their own family finances.

## **Relief Requested**

35. The Debtor requests that the Court Compel certain parties listed below, who have engaged in and wrongfully benefited from <u>self-help</u> and who have done so by in whole or in part:

   a. either their own acts of unlawful tender and/or in partial and/or full coordination with one another in other acts of obfuscation and/or deceit;

   b. wrongfully conspiring and otherwise taking actions or failing to take other proper actions such that <u>they could purposefully steer into their individual or collective possession and/or maintain control and disposition of and dominance over bank accounts, cash and/or checks totaling at least $144,771.53</u>

   c. <u>exerting influence and/or exercising communication and control and in a harmful manner to Debtor's business and key business relationships in so stealing the assets of the Debtor in various acts of self-help</u>.

36. The Debtor requests that this Court enter an Order directing the companies and individuals listed below to jointly and severally take any and all necessary actions post haste and <u>turn over</u> post haste any and all cash, checks or payments of any nature whatsoever as made by Debtor's Distributors and for the purposes of payment for SUP! and the invoices related thereto.

37. The individuals named acted in their corporate and/or personal capacities and remain involved and/or are known to have been in the chain of custody or otherwise influenced control and decision making authority at various points in time, directly relating to the present and/or past possession and/or control of Debtor's property (cash receipts and or remaining un-cashed checks). The specifically named parties below are those that the Court should exercise Domain over and are detailed as follows:

   a. Milwaukee Brewing Company, (MBC);
   b. Liquid Collective LLC as formed by Rob DeJong Esquire and as used as the entity which veiled the wrongful tender of Debtor's Checks;

    c. Rob deJong, Esquire, in his capacities as General Counsel to MBC and Officer of the Court, unsecured lender to MBC, shareholder of MBC, Board of Director Member of MBC, personal Counsel to the Chairman of MBC as well as in his personal capacity;
    d. Robert Weber, in his capacity as Controller of MBC and as a Wisconsin Certified Public Accountant (CPA), as well as in his own personal capacities;
    e. David Hock, in his capacity as CEO of MBC and in his personal capacities;
    f. Jim Hughes, in his capacity as Chairman and controlling shareholder of MBC, and in his personal capacities;
    g. Megan Czajka, in her capacity as Senior Executive Assistant of MBC;
    h. First Business Bank of Madison, 401 Charmany Drive, Unit 100, Madison, WI 53719.

38. All of the above parties with the exception of First Bank of Madison maintain a business address at 1128 N 9th Street, Milwaukee WI 53233.

### Further Detailed Background

39. Debtor owns, controls and sells a highly in-demand alcoholic seltzer beverage branded as SUP!. It does so through over 55 exclusive Distributors across a broad swath of the US. These exclusive Agreements govern Debtor's and select others' exclusive rights to represent and sell SUP! across the US. These agreements further oblige the Distributors to pay the **_Debtor_** in good funds no more than 30 days after their receipt of the SUP! beverage and/or Invoicing by the Debtor (and/or to its appointed administrative agent). ("Atty SR Aff ¶25, 28 thru 32, 34 thru 38"). ("Brooks Aff ¶15, 18").

40. For a short period of time Debtor entertained maintaining an administrative office at the lavish and new 9th Street, Milwaukee, WI brewery and that MBC alleged would be efficient . As a result, some of the SUP! Distributors received early Invoices per the terms of their exclusive Distributor Agreements with Debtor listing the remittance address as the same as MBC's offices. Some Distributors subsequently wrote and mailed checks for payment of those goods sold to them by Debtor and sent them to the interim administrative address, or 1128 N 9th Street, Milwaukee WI 53233.

41. Shortly after Debtor made it clear that there were issues with MBC's prior financial and representations, MBC then took the opportunity to intercept the US Mail, removed the contents and then used the contents to leverage, coerce and try to control the Debtor and others and ultimately went so far as to wrongfully deposit Debtor's Checks by means of false pretense and other acts of deceit and/or misrepresentations. MBC was desperate for cash to make its payroll on or around this time. (See Attached Exhibit 10).

42. While the above was going on, MBC and the Debtor, at the behest of MBC were engaged in pre-petition re-statement negotiations discussing certain reform to the existing contractual obligations of MBC. ("Atty SR Aff ¶18"). (See Attached Exhibit 8).

43. These negotiations included MBC's among other odd and draconian demands that MBC's contract manufacturing case price would go up by about 40% (and all while market prices were falling as the COVID-19 economy had begun to take hold). ("Atty SR Aff ¶24"). (See Attached Exhibit 7).

44. MBC also attempted to use the confusion they created to extract further multi-million dollar concessions from the Debtor including massive, un-secured cash injections and of financing

obligations. This was an obvious ploy by MBC to try to escape the promises they had enticed the Debtor. When those threats and acts of coercion did not work, MBC then informed the Debtor, by and through three parties, its Counsel and unsecured lender, Rob deJong, CPA Weber and CEO Hock that MBC had taken possession of checks due to Debtor under Debtor's Distribution Agreements. deJong even went as far as to represent to Debtor's Counsel that MBC did not intend to release Debtor's property (or if at all) until a reformed production agreement was reached and along the lines of the grossly favorable terms they were trying to leverage into being and by means of self-help and theft of the contents of the US Mail. ("Atty SR Aff ¶24, 34 thru 38").

45. To add more pressure and when MBC's ongoing acts of self-help didn't get the change in terms they desired, then Attorney deJong made it clear that a condition of any ongoing negotiations and or the provision of finished goods as the existing contract required <u>was that there would be no further discussions of the checks he and MBC were holding</u> and that if there were any further requests for their return all discussion would be terminated. This happened on or about April, 2020 and executives for Debtor were informed by Scott Robinson, Esquire (lead negotiator for Debtor) that this was the newest MBC position. ("Atty SR Aff ¶40").

46. On are around the same time, Chairman Hughes had direct phone discussions with RS Brooks in a Principal to Principal effort to keep things less explosive. On at least one occasion Hughes made it a point to say that he was "sorry for the hard negotiation tactics." ("Brooks Aff ¶15").

47. CPA Weber also confirmed by means of an e-mail shared by Attorney deJong that he had taken control of the checks (which he then claimed summed to about US$82,000 well in excess of deJong's earlier representation of US$32,000) and that they were all under "*lock and key*". ("Atty SR Aff ¶36").

48. Attorney deJong did not dispute CPA Weber's written representations and in fact passed them along to offer alleged comfort but more genuinely double-handed dealing signaling to Debtor within a situation that had become wildly uncomfortable that they best give in.

49. Both CPA Weber and Attorney deJong in their corporate and individual capacities further represented that any future checks would likewise be accounted for and kept "*under lock and key*".

50. Not long after those promises were made some if not all of the checks, and many listed by CPA Weber as "*under lock and key*" began to be tendered, deposited and otherwise "cashed." This was done by ruse using mobile phone(s) deposit(s) which involves taking of a picture of the front and back of the check. This time period appears to be about the same time as unsecured lender deJong disclosed to Attorney Robinson that MBC was having serious cash flow problems inclusive but not limited to making payroll. ("Atty SR Aff ¶42, 43, 44"). ("Brooks Aff ¶18"). (See Attached Exhibit 11).

51. Some of the checks, such as the typical one attached to this Motion further began to be presented for payment at various FDIC Insured banking institutions clearly carrying the Debtor's name as payee and an odd and often (if not always) illegible and incomplete endorsement signature all of which were aimed at deceit and manipulating their tender through the US Banking system. ("Atty SR Aff ¶34 thru 37, 42"). ("Brooks Aff ¶18"). (See Attached Exhibit 11).

52. Further, some such endorsements became even more highly suspect and out of the ordinary compared to what is commonly known to be the reputable standard of: "FOR DEPOSIT ONLY – (*name of company*)" endorsement. Signatures are illegible and the company name

benefiting from the deposit was omitted (and Debtor has come to believe purposefully so). (See Attached Exhibit 11).

53. Debtor was and remains aware by means of multiple written representations by CEO Hock that about this same time Atty. Rob deJong had "taken over" all talks and issue management between MBC and Debtor and that he was the sole person in charge. (See Attached Exhibit 12).

54. By this time, Debtor became more acutely tuned into the fact that in the months leading up to this point Attorney deJong had personally made even more unsecured and highly risky loans inclusive of what he repeatedly represented was "his son's wedding money". These loans to his Client, MBC were allegedly in order to keep the company a going concern. This was very odd and irrational economic behavior as deJong is a tiny shareholder and lender as others have similar high-risk loans in the millions. Debtor became concerned as to other forms of self-dealing it may not be aware of and that deJong may try to be hiding by kicking the can down the street, even if just for a week.

55. Attorney deJong repeatedly asked the Debtor if the sums he had loaned and that represented re-allocated "wedding money" from his family accounts might be paid back as a priority (were a joint venture to be established).

56. The sum of these actions left the Debtor deeply concerned that the odd endorsement(s) might be to aid deJong and/or others to cash checks and further gain control of desperately needed cash and/or secret away assets of the Debtor to further coerce Debtor to cave to their terms. ("Brooks Aff ¶15").

57. In addition to the pressures of deJong's odd "wedding fund" loans, Debtor was and remains aware as a result of CPA Weber Disclosures that prior to and at the time the Debtors checks started to be cashed by an unidentifiable endorsement, MBC was "late" on over 70% of its millions of dollars in trade Accounts Payable. In fact, Weber acknowledged during diligence work that MBC had generally not been paying its obligations as they came due and that such had been the case for some time. Further, Debtor received information via CPA Weber that other key suppliers were tightening up credit terms offered MBC and mostly in light to an ongoing history of late payments and poor communication. ("Atty SR Aff ¶33"). ("Brooks Aff ¶12").

58. Debtor continued to became more aware of bizarre written demands and statements by Attorney deJong (as he tried to pressure and/or coerce new contract terms that grossly benefitted MBC) including written statements by him that were considered extraordinary such as "*we need the cash*".

59. On or around this same period of time, MBC was seeking to find cash by other means such as new and/or additional debt financing (and/or terms of accommodation on existing and troubled loans owed by MBC). Debtor came to understand that the targets were First Bank and/or the Milwaukee Enterprise Development Commission (MEDC, a quasi-public financing agency known to be friendly to Attorney deJong).

60. As a result of these bank borrowing campaign(s) of MBC, Debtor became aware of additional financial reporting irregularities by CPA Weber and all while he was under the control and direct guidance of CEO Hock, General Counsel deJong and Chairman Hughes. Many if not all of such anomalies were championed as true and accurate representations and became part of the financial comfort proffered by CEO Hock and Atty deJong as they pitched to outside third parties and while unfairly leveraging the Debtor by means of mail theft and other acts of aggression.

61. Not long after the reality of all the above described events became clear to Debtor and Attorney Robinson, MBC then began to advertise on the internet that it would sell small quantities of their alcoholic seltzer out the door of and/or by means of "curbside pickup". This style of "bake sale" fund raising shows the failure of MBC executives and board members to grasp and be grounded in the reality and degree of their financial peril. Acts of desperation like this also tend to be seen as an act of desperation more often further worrying creditors and promoting their further closing in and managing exposure to the failing company which Debtor understands to be underway. (See Attached Exhibit 13).

62. Adding insult to injury, the product advertised by MBC for "curb-side" pickup is an illegitimate knock-off of the SUP! unique USDA Approved Organic formulation. This constitutes yet another asset raid by MBC as it relates to Debtor's Intellectual Property, USDA Organic IP that was developed for Debtor and charged to Debtor by MBC in the form of various services and fees. Further first day IP and related requests for relief are expected to be filed in the near future and as a continuum to the typical first day Motions used to shape the early stages of essential protections.

63. Debtor has prepared a Post-petition schedule of checks it understands have been deposited and thus the funds that have been taken out of Debtor's possession and/or control. Presently such amounts total US$144,771.53 and the amount is believed to be growing. ("Atty SR Aff ¶36"). (See Attached Exhibit 5).

64. Debtor further asks this Court to Order and as is presented herein in the proposed Order requested by the rules that all the parties named in this Motion disclose fully and "post haste" of this Court so Ordering the following facts, and as may be known to each of them in whole or in part:

   a. Who is the endorser of check(s)? (See Attached Exhibit 11).

   b. Whose mobile phone was used to transfer the checks by mobile deposit and what is the phone number (for each deposit made)? (See Attached Exhibit 11).

   c. Who was in control of the phone used as the time the checks were conveyed over the wires to First Business Bank of Madison, WI (for each Deposit made)? (See Attached Exhibit 11).

   d. Who took possession of the checks that were "under lock and key" after CPA Weber made his written representations?

   e. Who are the signatories on each and every account that checks were deposited into and what is the name on all such accounts and the bank maintaining the account. Who withdrew money over the last 60 days?

65. Additionally, and as part of the proposed Order to Turnover provided to the Court, the Debtor asks that there be an obligation placed upon all of the same parties named in this Motion to provide immediate NOTICE by e-mail to Counsel and to be named Debtor executives as well as turnover any further assets (such as checks, cash or any other instruments that in any way related to any of the Debtor's Distributor relationships) and to all of the above "post haste" of the order issuing and for at least the next ninety days.

66. The Debtor seeks this Order compelling the named parties to turn over the cash on the schedule provided and all other cash or assets, all being above mentioned Property of the Debtor's estate. Pursuant to 11 U.S.C. § 542(a) "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title shall deliver

to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."

67. The Debtors Property (checks and cash) as cited herein and contained on the schedule provided is consequential in value to the Debtor and is required for the reorganization of the Debtor under the auspices of this Court. ("Atty SR Aff ¶33"). (See Attached Exhibit 5).

68. Further, under 11 U.S.C. § 521(a)(4), the Debtor shall "surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and paper, relating to property of the estate."

68. Accordingly, both turnover under 11 U.S.C. §541(a) and surrender under § 521(a)(4) are appropriate and warranted and duly requested remedies being sought by the Debtor.

70. The Debtor therefore seeks entry of an order compelling MBC and all the Parties cited herein to turn over the cash and other property consistent with 11 U.S.C. §§ 542 and 521 "Post Haste".

71. As required by local rules, the Debtor has provided a Draft Order consistent with the requests contained herein.

72. Finally, and in light of the egregious conduct of MBC and/or all others cited herein and as evidenced within this Motion and which is further supported by the attached Affidavit from Counsel of good character and standing in Colorado, Scott Robinson, Esquire, the Debtor requests that the Court hold at another time and place convenient to it hearings for the recovery of legal fees and costs associated with the USBC action(s) and this turnover filing and all as occasioned by the MBC and related parties' hyper-aggressive and coercive actions. ("Atty SR Aff ¶(All)"). ("Brooks Aff ¶(All)").

WHEREFORE, the Debtor respectfully requests that the Court enter an Order compelling the Debtor to turn over the cash and other property as outlined in Debtor's proposed Order and for such other and further relief as the Court deems necessary.

Submitted this 18th day of May, 2020.

/s/ Michael J. Davis
Attorneys for Defendant:
Michael J. Davis, #44287
Davis Law Group LLC
2255 Sheridan Blvd.
St. C272
Denver, CO 80214
Ph: (720)361-6036
Fax: (720)368-5262
mdavis@mjdavislaw.com